This is 24-7100 United States v. Barker. Mr. Pincus, you may enter an appearance and proceed. Thank you, Your Honor. May it please the court, my name is Howard Pincus from the Federal Public Defender, and I represent Coker Barker. The confrontation clause prevented the introduction of William Lozier's prior testimony at Mr. Barker's murder trial, unless the prosecution proved Mr. Lozier was unavailable. But the prosecution did not show was unable to locate Mr. Lozier despite reasonable efforts. What it offered about contact with his family was too vague to show its efforts to locate him that way were reasonable. And in two other regards, its efforts were minimal and on their face were not reasonable. The district court therefore violated the Sixth Amendment by admitting Mr. Lozier's prior testimony and this court should vacate his convictions. William Lozier's testimony played an important role in the prosecution's case here. The prior testimony put Mikkel Kilo's car at the Barker Little house on the night he was killed. It said that Mr. Barker had told Mr. Lozier that he was interrogating somebody and to look out for the police. It recounted Mr. Barker's admission later that night that he and Ms. Little had, quote, beat him to death, unquote, and that they had dumped the body and shot the person in the head. No trial witness put Mr. Kilo at the Barker Little house that night or testified to a clear admission that Mr. Barker had, that he was involved in the killing. And Mr. Barker's, Mr. Lozier's prior testimony also linked Mr. Barker to incriminating jail notes that the prosecutor touted as important evidence in this case. The serious nature of the charges and the importance of Mr. Lozier's prior testimony each independently called for increased effort by the prosecution to locate Mr. Lozier before he could be determined to be unavailable. And they bear on what this court has said is a good measure of what is reasonably expected of the prosecution. It had to make the same efforts to locate and secure Mr. Lozier at trial that it would have put forth if it did not have his prior testimony. Prosecution did present a report that recounted contact with Mr. Lozier's family. It recited that at the request of the FBI agent, a deputy sheriff had reached out to William Lozier's family which had not seen him in months. But the report did not say with whom the deputy had spoken. Did not give a relationship of that relative to Mr. Lozier or provide any indication of how close that person was to Mr. Lozier or the likelihood that the person would be in contact with Mr. Lozier. And the report also did not provide a timeframe. This was too vague to show the deputy Brooks had made reasonable efforts to locate Mr. Lozier through his family. Perhaps a single contact with a family member of unknown closeness to Mr. Lozier at an unknown time provides no basis to believe that the prosecution made reasonable efforts to locate Mr. Lozier through his family. It certainly does not show that the prosecution made the same effort in this regard that it would have done if it did not have the backstop of Mr. Lozier's prior testimony to use in its case. In two other areas, the prosecution identified, the record shows that what it did was not in fact reasonable efforts to locate Mr. Lozier. The first of these is what the prosecution did with what it said was where it believed Mr. Lozier might be staying in the week before trial. All the authorities did was go to that house a single time and knock on the door. They did nothing more when there was no answer. They did not try another visit to the house. They did not try to ask any neighbors if they had seen Mr. Lozier or had any information about him. Doing nothing when there was. But did they have some information that this gentleman had been taken to a shelter in Oklahoma City at one point and he's pretty much transient in nature. He hadn't showed up for an uncle's funeral according to the family. He hadn't shown up for, sorry about that, guys. He hadn't shown up for his uncle's funeral which his family said was very strange. They hadn't seen him for months. Whoever it was, hadn't seen him for months. Well, we don't know when that was. Well, I understand that, I understand that. But this is a transient person who's got two bench warrants out for his arrest. They apparently tried to call some homeless shelters. They knew he was at a homeless shelter at one point, taken there by a family member. This isn't like we've got a person who's living at a residence and we believe that he's there and we ought to be able to just go and find him. Well, the prosecution itself then said that it had reason to believe that he was living at a particular address. And that's the one that they went and checked one time. They went to, they knocked on the door and they did nothing more. They didn't go back another time. We don't even know what time of day it was. They saw that there was no mail addressed to him there, the two pieces of mail, but even the government doesn't rely on that. They didn't, there's no evidence they spoke to any neighbors. They did nothing to really, other than knock on the door. That's not true. What's your best case that would indicate that this idea of vagueness, that they took all these various actions but we don't have specifics on them and that you've got to have some fairly fine detail here. What, when, where, how, with respect to many of these different acts. Harbin from the Eighth Circuit talks about how general statements without detail are not enough. And this court in Cook talked about how perfunctory efforts are not enough to meet what is a reasonably high good faith standard in this context. What were the general statements in Harbin? I don't recall off the top of my head what the general statements were. Just wondering if they were analogous here to what we have here. But this, it's hard to imagine anything more general than I spoke to a family member. You know, we don't know who that person was. It's unlike the cases the government relies on here where there was talk, where we know who they spoke to. Somebody who knew that the uncle had died and it was very odd that he hadn't shown up and that he hadn't been seen for two months. Sure, somebody. There wasn't enough information about him to know that this was unusual. Certainly a family member.  But it could have been a second cousin. Okay. Or it could have been a brother. Could have been a father. We have no idea. And it's the government's burden to make this showing. As this court said in Cook, if there's any uncertainty, that cuts against the government, which is the proponent of the unavailability showing. And remember, this showing allows prior testimony to be used and deprives the person of the right of confrontation. So Mr. Barker did not have the jury able to see Mr. Lozier testify to adjust his questioning in light of the jury's apparent reaction to the witness. Didn't have that face-to-face confrontation that's so important for the Sixth Amendment right. In terms of the homeless shelters, that's a logical place to look for somebody who's homeless. But what the government, there's no showing here that the government did anything more than make calls to three shelters. Perhaps a single call. They didn't reach out to the websites, look at the websites and perhaps email, which at least for two of them was available back at the time of trial. They didn't go to the shelter, which would be the obvious and easy way to find, to see if somebody was there and to speak to staff and residents to find out whether Mr. Lozier had been there and what information they might have about him. Is it your position that all they did was to call in to the three shelters and got no, no one answered the phone? Well, and that's what this statement says. It says that calls were made to three shelters and the calls were unanswered. So if the government had needed- That's all we have on evidence of their efforts to reach out to shelters. That is all we have, yes. And they only did that after the court said he was dropped off at a shelter. Have you gone there and looked for him? Did the court say, have you gone there to look or have you checked with the shelters? Perhaps have you checked into that? Have you looked into that? But they did find out that there was no shelter around Tinker Air Force Base, but it was logical to look for other shelters in the Oklahoma City area. They made perhaps a single call to three. There were three more at that time where Mr. Lozier could have been staying and they apparently made no effort at all with respect to those. Is there anything in the record that indicate that Mr. Lozier had a history of using shelters? Other than the fact that a relative said he asked to be dropped off at a shelter, no. But again, this is a likely place to look for somebody and the government had an agent actually call the shelters. So the government evidently agreed that a homeless shelter is an obvious place to look for somebody who's homeless. The failing is how little they did in that regard. Making a single call that went unanswered and then nothing more is not at all reasonable. And it's certainly not what the government would have done if it didn't have Mr. Lozier's prior testimony and needed him, an important witness, for this murder trial. And that's what has to happen. They have to make, that's the good measure of reasonableness. What efforts would they have made if they didn't have the backstop of Lozier's prior testimony and needed him for its case at trial? They can't do less when what's at stake is Mr. Barker's confrontation rights. Can I switch gears a little bit?  On you and talk about the, was a preliminary hearing in state court for Ms. Little where Mr. Lozier testified? It was a preliminary hearing in state court, yes. I think it was for both of them. And Mr. Barker was there. Certainly he was represented there, yes. And as I understand it, he had the right to cross-examine. He did, we are not, there was an argument. I understand you're not contesting that. I'm getting to the harmless error. Okay. I mean, his testimony on paper is devastating, correct? His testimony on paper is devastating, which is why he needs to be able to cross-examine. There's prejudice here because the jury could not look into the witness's eyes. They couldn't see the witness live. I'm not sure I see how that's going to detract from this testimony that he gave about the notes when there's fingerprints all over them and that there's little they could do with his cross-examination. And in fact, Barker chose to do nothing at the hearing. No, he did cross-examine on some things at the hearing, but if... So we do have that cross-examination that would be available. We do, and we have that in, there always has to be at least an opportunity for cross-examination of prior testimony. So we have to assume that that lawyer did the best job that lawyer could in cross-examining. At that time, with the limited information, we're not saying that that doesn't suffice for, to allow his prior testimony to be introduced if he's unavailable. And... Okay, but wait a minute. You not only had Mr. Loeser testifying orally, but you had the papers, right, where there's fingerprints all over it. We did, but let me get back to the first part about the importance of face-to-face confrontation. That is a critical aspect of the confrontation clause before the jury. So this jury could make a determination. As the Supreme Court said, I think, in Coy, look me in the eye and say that. I think that's how Justice Scalia started the opinion. He had the right to have the jury, which was deciding his actual guilt on murder, be able to determine whether it believed, by seeing Mr. Loeser live, whether it believed his accusations, and in terms of the- But let me, there was independent evidentiary support for what Mr. Loeser was saying, quite independent of his own testimony, correct? I'm not sure what you're referring to. If you're referring to the notes, I do want to address that, the Kites. I am talking about the notes. Okay, the Kites, even the, Mr. Loeser's preliminary hearing testimony linked the Kites to Mr., the supposed Kites, to Mr. Barker. He said, I got them from him, okay? Even the government, when it says, without Loeser's testimony, this is the evidence we had, doesn't refer to the Kites. Mr. Loeser, who was facing charges himself and was hoping for leniency from cooperating with the government, may have written those Kites himself. We just don't know. And it's also a link- But wasn't there forensic evidence of that Barker had touched and passed the notes? Yes, and we have no idea whether they shared a cell, what the access was in that jail, whether Mr. Loeser could have gotten the paper from Mr. Barker. What I think you need to address is that, that notes that support Loeser's testimony have an indication that Mr. Barker had handled those notes. Not handled those notes, handled that paper. He could have, they could have been in the same cell. They added the notes after he passed a blank piece of paper to somebody? Not that he passed a blank piece of paper, but that Mr. Loeser had access to the blank piece of paper. And the government could certainly have tried to disprove that. Or they said they had a handwriting analyst, but they never produced one at trial. That's the easiest way to show that this is Mr. Barker's handwriting, but they didn't do that. And they didn't do that- What was the cross-examination at the preliminary hearing? What about the Kites? I'm not sure there was- What came out of that? Was there anything? I'm not sure that there was. But certainly they didn't go into this level of detail, which my point is, is that we just don't know from the trial testimony what the Kites, that the Kites were actually written by Mr. Barker. And that's critical. And his hearing testimony, even if there was cross-examination with it, is not enough if he's not, if he's available. The jury still has the right to look him in the eye and make its own credibility determination about him, regardless of what was said at the preliminary hearing. Do you have any authority that suggests in any way that when you're talking about the confrontation clause, is that there's a heavier burden for the prosecution to show that the error was harmless? Well, it's a constitutional violation, so of course they have to show- I understand, but do you have any specific authority that says when you're talking about the confrontation clause, the concept of harmless error has a totally different complexion? I'm not sure it has a totally different complexion, but it's the traditional harmless without a reasonable doubt. You don't have any authority indicating that harmless error is treated differently under confrontation clause cases than it is under other cases? Other than, you mean more strictly than harmless without a reasonable doubt? No. Yeah. Yeah, but it still has to be shown to be harmless without a reasonable doubt, and that's a very strict requirement, and the government does virtually nothing here to try to meet its burden. It's not our burden to disprove harmless beyond a reasonable doubt, it's the government's burden to show it's harmless beyond a reasonable doubt, and they've utterly failed to do that. So, I'm way over? We would ask- You are, I'll give you some rebuttal. Okay, we would ask the court to vacate Mr. Barker's convictions and remand for a new trial. All right, thank you, counsel. Let's hear from the government.  May it please the court, good morning. Jared Lehman on behalf of the United States. Your Honor, I want to start with one of the questions about visiting the residence of Mr. Lozier, and I'll read from one of the 302 reports stated March 28th of 2023. It's in the record at page 273. The house on Giselle Street, which is the house that they visited, had been a rental by Lozier's former girlfriend approximately four to five years ago. So, when they went and visited this house on the eve of trial, it was not where the defendant was currently living. So, it was a prior residence that the, I said defendant, that the witness, Mr. Lozier, had occupied with his girlfriend, and that was years in the past. So, I want to make sure that we're clear on that. I take it that was the only address that they had for him. That's correct, Your Honor. He was transient, or believed to be transient at that time. Yes, Your Honor, that's correct. Regrettably, I did not put a timeline. So, your suggestion is there really wouldn't have been any reason to keep going back to that house, because they had no reason to believe he was there, necessarily. That's right, Your Honor. Check. The government, my reading of the record shows the United States government's first contact with Mr. Lozier was in March of 2022, and that's in an interview. In that interview, he identifies himself as homeless. However, he says, I can get mail at a location known as Diversion Hub. And that's important, because they do contact Diversion Hub later, and they say that they've never heard of Mr. Lozier before. He also says, you can contact me through my lawyer. He's represented in an ancillary matter, doesn't have anything to do with this federal murder that's occurred. But in 2022, that's what he identifies himself as. I'm homeless. You can contact me at Diversion Hub. Also, please call my lawyer if you want to get in touch with me. She knows where I'm at. The United States keeps in contact with that lawyer who doesn't know where her client is at. And in fact, she makes a statement to the effect of, listen, if he gets picked up by another agency, I'll definitely let you know. I mean, you, the FBI, know that he's been apprehended, so you can come serve him this trial subpoena. How long after that was the little preliminary hearing? The preliminary, the state preliminary hearing, Your Honor, so the offense conduct is April of 2019. The state prelim is June of 2020. The FBI's, as it was, the United States indicts the defendant in May of 21. The FBI's contact with Mr. Lozier the first time is in March of 22. And that's when he tells them, I have this lawyer. Do we know where they found him in 2022? Your Honor, the record does not indicate how they found him in 2022. I'm sorry, those facts just don't exist in the record before us. Continuing on with their attempts to contact Mr. Lozier, they contact his lawyer again, they contact his probation officer, they contact the Seminole Police Department, which is where he lived, they contact an ATF task force officer in attempts to contact this gentleman, and they just simply can't find the guy. And I really want to dive down into this concept that we should have done more with the homeless shelters. Originally, there was some information from the family that they dropped him off in a homeless shelter. And when was that? The original homeless shelter family statement was gonna be in March of 2023. We follow up with that family member, also in March of 2023. And that family member clarifies, well, it wasn't really a homeless shelter, and I'm paraphrasing here. We took him to Tinker Air Force Base, which is in the Oklahoma City metro area, and just kind of dropped him off there. There's never a statement from the family, affirmatively, we dropped him off at a homeless shelter. They instead clarified, we dropped him off near Tinker Air Force Base. And in response to that, the FBI contacted Tinker Air Force Base, hadn't seen or heard from the witness, contacted the Oklahoma County Sheriff's Department, which shares some jurisdiction around Tinker Air Force Base, had not seen or heard from the witness, contacted the Midwest City and Dell City Police Departments, which abut Tinker Air Force Base in many areas. No contact with the witness in those instances either. The FBI goes on, contacts the Oklahoma City Police Department, who says, yes, we have had a contact, but when you look at the record, that contact was in July of 2022. So this is a year prior, almost, when the Oklahoma City Police Department had a contact with him. And the Oklahoma City Police Department's documents show that he was transient, but did list a phone number. The FBI called that phone number, and unfortunately, it was no longer in service. So in sum, the government has contacted several different police departments, about a half dozen by my count. They've contacted the witness's attorney, who he said, please contact me. They contacted the Diversion Hub location, where he said he could receive mail. And they had either never heard of him, or he was no longer there. They went to the last known address that the witness had. Unfortunately, that was years in the past that he was known to live there, but he is homeless, after all. But regardless, the FBI tried, and certainly went to that location in an effort to find him. Couldn't find him. Spoke to the family a number of times. And I appreciate the record doesn't indicate what degree of family they spoke to, but nonetheless, they were in contact with family of the witness, and unfortunately, they hadn't seen him. Further, keep in mind, against this entire backdrop, the witness has warrants for his arrest. If any law enforcement officer would have encountered this witness, surely something would have come up. But unfortunately, the witness was just, I'm not gonna say he's hiding, but he was just transient, if you will. And that doesn't mean that the government has the ability to find somebody. There was nowhere else for the government to look. There was no rock left to turn over. You indicated that the Tinker Air Force Base stuff was not specifically vis-a-vis a close shelter or anything. Did the first time the question of, or the suggestion that you should check with homeless shelters, was it the first time that happened was when the district court stated that? Your Honor, I believe that's what the record indicates. There's an original report to the effect of, we dropped him off at a homeless shelter. The district court, when they're doing their pretrial motions, say, hey, the district court tells the government, hey, I want you to look into that homeless shelter thing a little bit more. The government then re-interviews the family. So that's independent of dropping him off by Tinker Air Force Base. We learned that after the district court ordered us to investigate it a little bit more. So we have the original, Your Honor, we'd like to use this transcript. The witness is unavailable. We have a hearing on the matter. The district court reserves judgment on that issue and says, hey, government, I want you to go look into the homeless shelter thing a little bit more. The FBI then re-interviews the family and gets a more definite statement that, hey, what we actually did was dropped him off near Tinker Air Force Base, not at a homeless shelter. We just assumed that's where he was going. In response to that, they contact the Tinker Air Force Base, the abutting police departments, and then they also call three homeless shelters on the phone in the Oklahoma City area in response to the district court's inquiry. The government then refiles its motion. But they never talked to anybody at those shelters? The record does not indicate that anyone ever answered the phone, Your Honor. So correct, no one was actually spoken to by the government at the shelters. After that. Should they have done a little bit more, paid a visit to the shelter? I'm sure that staff, I mean, I doubt if we called a Denver homeless shelter today we'd get much response. It seems like the nature of the situation is that an on-site visit might be kind of your basic investigative approach. If there had been any indication that the witness was at the shelter, absolutely. But that turned out to be kind of a false flag or something along those lines. It just wasn't true that he was ever at a homeless shelter. And so there's no way to know that he was there. So it would have been an absolutely futile effort for the government to. Might they have done it if they didn't have his preliminary hearing testimony and were really needing this guy? Your Honor, I can't imagine anything else left for them to do. I really. How would they go to the homeless shelter directly? I don't know that they would have done that. I can't represent to the court that they would have done that simply because there was no one. Well, that's the question. I don't think. The Cook test is, you know. Would they have done more if they didn't have his preliminary hearing testimony? Certainly they could have gone to the homeless shelters. But I don't know that they would have. It's not a place that would have come up in their investigation to go look because the family said we didn't drop him off at a homeless shelter. We dropped him outside of Tinker Air Force Base. And that's where the FBI looked, at his last known location. So I can't represent to the court that they would have actually gone had we not had the backdrop of his state-level preliminary hearing transcripts. After the district court suggested contacting homeless shelters and something was done, was there a hearing where you reported back to the prosecution, you reported back to the district court as to what specifically they had done vis-a-vis shelters? Yes, there wasn't a hearing in the traditional sense,  As I read the record, my understanding is the government resubmitted its motion to use the witness's testimony and made attachments of the FBI 302s of the government's attempt to go and locate the witness again and specifically included the reference to the homeless shelter. In response to that, the district court issued an order saying, okay, I'm going to allow the transcript to be read and the defendant, Mr. Coker Barker, filed a standing objection to that order. So it was just paper back and forth. There was no live engagement on the issue in court. That's my reading of the record. However, Your Honor, I will say that the parties were actively discussing this. If you read kind of the gray space in the transcript when the jury's out, they're actively discussing this transcript, how they're going to read it, how they're going to get it in, write a jury selection. They're discussing it at breaks during the trial. The transcript itself isn't read until I believe day three of the trial. So it's a near constant topic of discussion throughout the recesses, if you will, of the trial in the space outside of the jury. So it's something that's talked about very frequently, Your Honor. And I will add in response, the defendant filed a trial brief, if you will, with the court, the district court, after it issued the order saying, hey, we want to impeach with some things that maybe didn't come up in the transcript. And so there was a number of filings and discussions throughout the case about Mr. Lozier's testimony. If there's no further questions, I'm inclined to cede my time, and I would ask that this court affirm the defendant's conviction and sentence. One thing, are you persisting in your position that the objection was not preserved? The defendant had ample opportunity. I've read it all. I've heard what you said in paper. Are you persisting in that position today? Yes, sir. All right. Thank you, counsel. Could you give counsel's excuse? Appreciate the session. Could you give Mr. Pincus two minutes? Just quickly on the preservation, if you look at volume one of 262 to 263, the district court understood that this was a confrontation clause claim. In terms of what the government said about the house on Gazelle Street, this is not what they said in the district court there. They said the house on Gazelle Street, they attempted to locate Lozier at a house where it was believed he might be staying. They had both of the exhibits then. They didn't make this claim that those were one and the same house, and there's no way to tell that from the record, and we can't assume our way into a finding of unavailability. It's the government's burden. It can't say just because both houses, there were references to a house on Gazelle Street that they're one and the same house. This is, I think the house numbers, one house number is like 1228, so there's clearly many blocks of Gazelle Street, and there's no way to say that it's one and the same house. In terms of contact with police, that's all well and good, but it doesn't show they made actual, they made reasonable efforts to locate him at a homeless shelter, which of course is a likely place, a reasonable place to look for somebody who is homeless, and to say I can't say whether they would have looked, the point is they should have looked there, and they should have done much more than make a phone call. In terms of whether there was any discussion of unavailability on the record, there was at volume three, I believe it's pages 12 to 16, there was some discussion at a pretrial conference, and that's where the court said what have you done to locate Mr. Lozier, and I think you should look at a homeless shelter if there was evidence he was dropped off there, and even if there wasn't evidence that he was dropped off there at a homeless shelter, it's still a place where they should have looked for him, and they didn't, and it's the government's burden, and any factual uncertainties here cut against the government. So again. What was the length of time between trial and the statement by the family member that he had been dropped off at Tinker Air Force? Was that, do we have, was it a year, was it six, do you have any idea what the time difference? We don't, because all the FBI agent's report says is I spoke to the deputy sheriff on March 10th, I believe, and he recounted that at our request he had made inquiries, but we don't know when those inquiries were. We don't know when he's reporting that from, so we really don't know. Same as with the uncle's funeral. We don't know how far back in time that was. I thought they spoke to the family in March of 2023. No, what the FBI agent says is that's when I spoke to the deputy sheriff, and he reported that at our request, but we don't know when that request was. So we just don't know, and what we do know is close in time to trial they apparently had a residence where they thought he might be. They went and knocked once and nothing more, and they didn't check the shelters. They didn't go to the three, and there were three more they should have gone to. All right, counsel. Thank you very much. Your excuse, those were helpful arguments. We appreciate that. The case shall be submitted, and the court will take a brief recess.